Bennie Blatt v. Commissioner.
Blatt v. Commissioner
Docket No. 10064.
United States Tax Court
1947 Tax Ct. Memo LEXIS 315; 6 T.C.M. (CCH) 94; T.C.M. (RIA) 47020; February 10, 1947
David D. Weinberg, Esq., 600 Keeline Bldg., Omaha, Neb., for the petitioner. Harlow B. King, Esq., for the respondent. LEMIRE Memorandum Opinion LEMIRE, Judge: The Commissioner determined a deficiency of $52.82 in the petitioner's income tax for the calendar year 1943. The petitioner claimed in 1942 and 1943 deductions for expenses of (1) meals, shortages and entertainment, and (2) the cost and cleaning of uniforms. The Commissioner determined the deficiency by disallowing the *316 deductions for both years. He made the adjustments to 1942 net income for the purpose of giving effect to the forgiveness provisions of the Current Tax Payment Act of 1943. The petitioner contends that the deductions in question are allowable as "ordinary and necessary expenses paid * * * for the production or collection of income" within the meaning of section 23 (a) (2) of the Code, as amended. [The Facts] The petitioner and his family resided in Omaha, Nebraska, during the years 1942 and 1943. His returns for those years were filed on the cash basis with the collector of internal revenue for the district of Nebraska. During the first eight or nine months of 1942 the petitioner was employed by the Roberts Dairy of Omaha as a wholesale milk salesman. He sold and delivered milk over a daily route of 35 miles in Council Bluffs, Iowa, across the river from Omaha. The Dairy paid the bridge toll of 20 cents each way. In the latter part of 1942 and throughout 1943 the petitioner was employed by the Petersen Baking Company as a wholesale bakery salesman. He then sold and delivered bakery products over a city route in Omaha. Both employers paid him a salary plus commission on weekly *317 sales over a fixed amount. The Banking Company guaranteed him a weekly salary of about $37.50 plus commission of 6 per cent on all sales over $275 per week. One of the petitioner's duties was to display his merchandise at a prominent position in refrigerators or on racks in his customers' stores. The petitioner followed approximately the same schedule in both employments. He loaded his delivery truck at about 4 o'clock in the morning and was thereupon charged with the merchandise to be delivered. He made deliveries to and collections from his customers from about 6 o'clock until about 3 o'clock in the afternoon. He ate breakfast and lunch en route and paid for them with his own funds. Upon completing his deliveries he returned to his employer and settled for the day's business with funds which he had collected. He was required to make up any shortages in his account from his own funds. The petitioner was away from home an average of about 11 hours each working day. On some occasions he was away from home 12 or 13 hours. In the petitioner's 1942 return he deducted $150 as "Expenses of meals away from home, $3 per week". That amount was estimated. The petitioner testified that such *318 amount included not only the cost of meals but also the shortages which he made good to his employers, and the expense of entertaining his customers. The petitioner kept no record during 1942 and he has offered no proof or estimate of the amount of such expenses beyond the statement in his return. In the petitioner's 1943 return he deducted $156 as "Road expenses as bakery salesman, 52 weeks X $3 = $156, for losses, etc." That amount also was estimated. The petitioner kept a record during 1943 which shows that he paid a total of $146.57 for "breakfast and lunch" and $19.90 for shortages. He testified that he had shortages of $42.30 and the respondent has accepted that amount on brief. However, the respondent points to the undisputed fact that the petitioner collected more money on several occasions than he was required to pay to his employers. The petitioner made no record of such amounts and he has offered no proof or estimate thereof. Thus, there is no evidence in the record from which the net amount of the shortages during 1943 could be determined. Similarly, there is neither proof nor estimate of the amount of entertainment expenses during 1943. That part of the deduction which *319 represents the expense of meals away from home, however, is supported by proof that the petitioner paid $146.57 during 1943. [Opinion] The petitioner claims that the expense of his meals away from home is deductible under section 23 (a) (2). The respondent contends that such expense is not deductible under section 23 (a) (1) (A) which allows as deductions "traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business". The facts show that petitioner's home and business were in the same general vicinity. Certainly he was not required to eat breakfasts away from hom. And he was in no different position from any other person whose daily business makes it impossible to eat lunches at hom. In our opinion the petitioner was not "away from home" within the intendment of section 23 (a) (1) (A). No different result should obtain through the application of section 23 (a) (2). In both of the committee reports (H. Rept. 2333, p. 75, and S. Rept. 1631, p. 88, 77th Cong., 2d sess.) section 23 (a) (2) was explained in part as follows: A deduction under this section is subject, except for the requirement of being *320 incurred in connection with a trade or business, to all the restrictions and limitations that apply in the case of the deduction under section 23(a)(1)(A) of an expense paid or incurred in carrying on any trade or business. * * * We hold that the petitioner's expense of meals was a personal living expense within section 24 (a) (1). The Commissioner was not in error in disallowing deductions claimed by the petitioner in 1942 and 1943 for expenses of meals, shortages, and entertainment. The petitioner also claimed deductions for the purchase and cleaning of uniforms. Under the provisions of a union contract the petitioner was required to wear a specified uniform while on duty for the Petersen Banking Company. The contract provided in part as follows: Employees shall report for work in neat attire. Employees covered by this contract, when required to do so, shall wear uniforms selected by the Employer. The Employer and the employee shall each pay one-half of the cost of such uniform, which shall belong to the employee. Such uniform shall be maintained and cleaned by the employee, and shall not be worn at places which would bring reproach upon the Employer and employee alike. *321 For the purpose of defining a uniform as herein used, it shall mean and include, cap, shirt, trousers, coat, sweater, or any articles of clothing, the particular type of which is required by the Employer, whether bearing the Employer's insignia or not. The petitioner paid $49 in 1942 and $61 in 1943 toward the cost of his uniforms. These payments represented one-half of the cost of four uniforms, a summer and a winter uniform having been purchased each year. The petitioner also paid $9.60 each year for cleaning his uniforms. The uniforms consisted of caps, shirts, trousers and blouses or jackets, which were worn in different combinations at different times. The summer uniform was tan and the winter uniform was Oxford gray in color. The cap and outer jacket of each uniform bore the Baking Company label, approximately three inches square, which was sewed on the outside of these articles. The uniforms were not designed or intended for social use but were tailored and were comfortable to wear. They were made of durable material, with heavy seams, reinforced pockets, and a double seat in the trousers. They were subjected to severe wear and tear. The petitioner wore out a summer and *322 a winter uniform each year. The Banking Company placed no restrictions on the wearing of the uniforms except that they be worn by the petitioner when working and not worn in any places which would bring reproach on him or the company. He wore the uniforms to and from work and in public eating places for breakfast and lunch. He changed into regular clothing upon returning home. Occasionally he took care of personal business in downtown Omaha after working hours and before returning home. He never wore the uniforms socially or used them in place of his work clothes at home. He kept his uniforms in a neat and clean condition. The prices of the uniforms were about one-third more than the amounts paid by the petitioner for similar articles of regular clothing. The respondent admits that the petitioner was required to wear a prescribed uniform in performing his duties but argues that the petitioner has failed to meet the burden described in I.T. 3373, C.B. 1940-1, p. 28, of proving that the uniforms were being used solely in his employment and are not adaptable to general or continued wear in the sense that they may be said to replace regular clothing. He argues, for example, that if the *323 petitioner were to quit the Baking Company he could remove the coat label and use all the articles as regular clothing. But the facts are that the petitioner did not quit and that he wore the articles only as uniforms in the course of his employment. Those articles are not adaptable to general or continued wear so long as the petitioner is employed by the Banking Company. We hold that the amounts shown to have been expended by the petitioner for the purchase and cleaning of uniforms are deductible. Marcus O. Benson, 2 T.C. 12, affirmed 146 Fed. (2d) 191; Eleanor E. Meier, 2 T.C. 458, and Helen Krusko Harsaghy, 2 T.C. 484. Decision will be entered under Rule 50.